ALFONSO E. ARANA, peticionario y apelante, *v.* MANUEL A. DEL VALLE, RAFAEL A. GONZÁLEZ, PEDRO A. CASTRO, DAVID RAMÍREZ y AMADOR JIMÉNEZ, en su carácter de miembros de la JUNTA EXAMINADORA DE INGENIEROS, ARQUITECTOS Y AGRIMENSORES, demandados y apelados.

Núm. 7114.—*Sometido:* Febrero 21, 1936. *Resuelto:* Abril 20, 1937.

*Abelardo Casanova Prats,* abogado del apelante; *Hon. Procurador General B. Fernández García* y *T. Torres Pérez,* abogados de los apelados.

EL JUEZ ASOCIADO SEÑOR HUTCHISON emitió la opinión del tribunal.

En un procedimiento de *mandamus* encaminado a obligar a la Junta Examinadora de Ingenieros, Arquitectos y Agrimensores a expedir una licencia para practicar la ingeniería civil, la corte de distrito anuló un auto alternativo previamente librado y declaró sin lugar la petición.

 La última actuación de la Junta había sido la expedición de una licencia como agrimensor e ingeniero de caminos, canales y puertos.

La corte de distrito resolvió que la experiencia de Arana, tal como surgía de su solicitud para que se le expidiera licencia y de su declaración jurada en relación con la misma, no le daba derecho a una licencia de ingeniero civil. La esencia de la declaración jurada de Arana se expone por el juez de distrito de la manera siguiente:

"En la declaración de Alfonso E. Arana, jurada ante el notario A. Casanova Prats, el 17 de enero de 1928, único documento presentado en este juicio acerca del ejercicio de la profesión de ingeniero civil por el solicitante y que sometió a la consideración de la junta, manifiesta que es de 24 años de edad, y que desde el 5 de septiembre de 1923, o sea a los 20 años, venía ejerciendo la profesión de ingeniero civil, siendo su instrucción, preparación y experiencia, la de haber cursado estudios desde 1920 a 1923 en el Colegio de Agricultura e Ingeniería de Mayagüez, hasta el segundo año de la carrera, y desde 1923 a 17 de enero de 1928, en las Escuelas Internacionales de Scranton, Pa., sin terminar dichos estudios.

"En cuanto a la experiencia y trabajo realizado aparece de la declaración que el peticionario desde el 5 de septiembre de 1923 hasta el 17 de enero de 1928 fué un empleado en el Departamento de Comercio de los Estados Unidos, en el Servicio de Faros, y que realizó trabajos consistentes en estudios, presupuestos, construcción y preparación en el noveno distrito de faros de Estados Unidos, realizándose obras bajo su dirección y supervisión consistentes en un muelle marginal, reserva de faros; una carretera de hormigón en el faro de Bor nquen, la instalación de un faro automático en la isla de Navassa; reparaciones de los faros de Maunabo y Cabo Rojo, de las carreteras de los mismos, y el muelle de Guantánamo, Cuba; y alteración de la casa del Superintendente. Hallándose en uso de licencia en 1924, manifiesta que fué director técnico de las obras de construcción de un puente sobre el Río Boca Prieta, de Humacao."

El puente tenía cuarenta metros de largo. La importancia del otro trabajo realizado aparece de la siguiente declaración detallada relativa al costo:

"Relación de Experiencia

"Tiempo: Desde, Hasta: Obras realizadas en el servicio de Faros desde Sept. 1923, hasta el presente, bajo mi dirección y supervisión.

"Por quién empleado: Bureau of Lighthouse. Clase de trabajo. Detallado: 1.—Muelle marginal, reserva faros, $100,000. 2.—Carretera hormigón, faro de Borinquen, $11,000. 3.—Instalación faro automático, Navassa Is., $11,000. 4.—Reparación faro Maunabo, $6,000. 5.—Reparación faro Cabo Rojo, $6,000. 6.—Carretera faro Manatí, $30,0C0. 7.—Carretera faro Cabo Rojo, $3,000. 8.—Muelle reparación de Guantánamo, Cuba, $3,000. 9.—Alteración casa superintendente, $6,000. Reparación y construcción en el distrito con presupuesto anual de $20,000.00.''

Es indudable que todos estos trabajos constituían proyectos de ingeniería. Fueron presentados como prueba de lo que Arana había hecho en su carácter de ingeniero. En vista de su declaración jurada al efecto de que él había realizado este trabajo como ingeniero, el peso de la prueba recaía sobre la Junta para demostrar que el mismo no había sido planeado, diseñado y ejecutado por él como ingeniero, asumiendo que así fuese. *Serra* v. *Junta,* 43 D.P.R. 759; *Llovet* v. *Junta,* 40 D.P.R. 583; *Arán* v. *Junta,* 40 D.P.R. 589; *González* v. *Junta,* 40 D.P.R. 591; *Flores* v. *Junta,* 40 D.P.R. 592; *Isern* v. *Junta,* 45 D.P.R. 582.

La expedición de una licencia como ingeniero de caminos, canales y puertos constituía en efecto una admisión de que el trabajo había sido realizado por Arana como ingeniero. Echando a un lado por el momento otros aspectos del caso, la única cuestión ante la corte de distrito fué al efecto de si la junta no debió haber expedido una licencia de ingeniero civil en lugar de una licencia de agrimensor e ingeniero de caminos, canales y puertos.

Los artículos 9 y 10 de la Ley núm. 31, aprobada en abril 26, 1927 (Leyes de ese año, págs. 183, 187), disponen lo siguiente:

"Sección 9.—En cualquier tiempo dentro de los seis meses subsiguientes a la fecha en que esta Ley empiece a regir, la Junta expe-

dirá una licencia para el ejercicio de la profesión de ingeniero, arquitecto o agrimensor a cualquier persona que, una vez satisfechos los derechos que más adelante se estipulan:

"(a) Haya terminado el curso de ingeniero, arquitecto o agrimensor en una escuela o universidad; o

"(b) Haya estado en el ejercicio de la profesión de ingeniero, arquitecto o agrimensor por no menos de tres años con anterioridad a la fecha de la aprobación de esta ley.

"A menos que exista prueba en contrario, la Junta aceptará como evidencia satisfactoria la declaración jurada, expresada en la solicitud, de que el solicitante ha ejercido la profesión de ingeniero, arquitecto o agrimensor por un período de tres años.

"Sección 10.—La Junta expedirá las licencias indicando en ellas la rama de ingeniería para la cual la persona a quien le haya sido expedida esté autorizada a ejercer, como ingeniero civil, mecánico, electricista, etc.; *Disponiéndose,* que cualquiera persona que haya recibido un certificado autorizándole a ejercer la profesión de ingeniero civil, podrá a la vez ejercer como agrimensor."

De *Nelson's Encyclopedia,* Vol. 4, pág. 405, tomamos el siguiente extracto:

"*Ingeniería, Civil,* término que se usaba originalmente para abarcar toda la práctica de ingeniería que no estaba incluída bajo el encabezamiento de ingeniería militar, pero que está ahora limitado a la preparación de planos y a la construcción de estructuras fijas de carácter utilitario, a distinción de estructuras o máquinas movibles, que están dentro del campo del ingeniero mecánico, y de estructuras esencialmente decorativas, que son campo del arquitecto. Sus principales aplicaciones o campos de actividad son: (a) Asegurar el terreno contra fuerzas naturales, por medio de muros de contención, alcantarillado, trabajos de protección contra inundaciones, malecones, rompeolas, revestimientos de riberas, adoquinados, etc.; (b) la construcción de vías de comunicación, ya sean carreteras, ferrocarriles, canales, dragados, faros, túneles y puentes; (c) abastecimiento de agua a la zona urbana, mediante la construcción de pozos, represas, grandes estanques, acueductos, filtros, etc.; (d) alcantarillado para la zona urbana mediante cañería, filtros de desagüe y tanques purificadores, hornos, crematorios, etc.; y (e) construcción de edificios, plataformas, desembarcaderos y muelles. Incluye también la mensura del terreno mediante la agrimensura (q.v.) que también es requerida en casi todo proyecto de ingeniería civil.

"Con anterioridad al siglo XIX, prácticamente toda obra era realizada por arquitectos, artesanos e ingenieros militares. La construcción de máquinas, que era entonces un campo muy limitado, y la minería eran solamente ocupaciones especiales. A fines del siglo XVIII, el aumento y la complejidad de las construcciones crearon una demanda para hombres de habilidad excepcional y experiencia o preparación especial, para planear y dirigir la construcción de carreteras, acueductos, faros, puentes y otras grandes estructuras fijas. Así surgió una clase de hombres preparados tanto en el estudio analítico de estructuras como en la utilización práctica de materiales. Para distinguir a estos últimos de los ingenieros militares, que se dedicaban a problemas similares de naturaleza militar, se les llamó ingenieros civiles. Con el desarrollo de la máquina a vapor a principios del siglo XIX, surgió una demanda para ingenieros preparados especialmente en el diseño y construcción de artefactos mecánicos, y esto gradualmente condujo al desarrollo de un campo profesional distinto llamado ingeniería mecánica. (Véase, *ingeniería, mecánica.*) La explotación de minas también empezó a exigir la aplicación de experiencia y conocimientos científicos, y luego la utilización práctica de la ciencia de la electricidad desarrolló otra escuela especial de ingeniería. El campo dejado a la ingeniería civil es aun, empero, bastante amplio. El campo de sus actividades sobrepasa de una manera notable los ámbitos de un solo individuo y de una sola especialización, y ésta es la regla, como sucede en el diseño de puentes, ingeniería de abastecimiento de aguas, y el trazado de vías, etc."

Véase también 20 C. J. 1260 y el *Century Dictionary*, Vol. 3, pág. 1931.

El artículo 9 de la ley habla de "ingeniería, arquitectura o agrimensura" solamente en términos generales. El artículo 10 dispone que las licencias expedidas por la junta indicarán (bastardillas nuestras) "la rama de ingeniería para la cual la persona a quien le haya sido expedida esté autorizada a ejercer, como *ingeniero civil, mecánico, electricista, etc.*" La junta, en su reglamento, dividió la ingeniería en ocho campos de actividad, así:

"Ingeniería civil, ingeniero de minas, ingeniero agrónomo, ingeniero de montes, ingeniero mecánico, ingeniero químico, ingeniero electricista, ingeniero electroquímico."

Entonces subdividió el campo de ingeniería civil de la manera siguiente:

"Ingeniero topográfico, ingeniero de caminos ordinarios y de hierro, de puertos y canales, o de vías de comunicación; ingeniero municipal y sanitario, ingeniería estructural e ingeniería hidráulica."

Esta subdivisión de la ingeniería civil no es una clasificación tal como las previstas y autorizadas por el artículo 10. El "etcétera" debe ser interpretado en armonía con el contexto. Así interpretado significa solamente aquellos amplios campos de actividad que actualmente son considerados como departamentos separados e independientes de la ingeniería, hayan sido o no segregados del campo, originalmente más extenso, de la ingeniería civil. Los ejemplos dados por el artículo 10, o sea ingeniería civil, mecánica y eléctrica, son tales departamentos separados e independientes de la ingeniería. No importa cuál sea el estado actual de la ingeniería de caminos, canales y puertos, ella está clasificada por la propia junta como una subdivisión de ingeniería civil. Por tanto, no es una rama de la ingeniería "tal", como lo son la "ingeniería civil, mecánica o eléctrica". Es una subdivisión del campo de la ingeniería civil.

Conforme demuestra parte del testimonio aducido durante el juicio, la ingeniería civil anteriormente incluía ingeniería y arquitectura, y la ingeniería mecánica en una época incluía ingeniería eléctrica. La ingeniería de caminos, canales y puertos, según indica también este testimonio, puede incluir toda la experiencia material demostrada por la declaración jurada de Arana, excepto la partida relativa a las reparaciones de la casa del Superintendente, en Guantánamo, a un costo de $6,000. Incluye igualmente proyectos de ingeniería en que Arana nunca ha tenido experiencia efectiva, como por ejemplo, los planos, el diseño y construcción de canales y ferrocarriles.

Por más de un cuarto de siglo con anterioridad al año 1927 no existían restricciones sobre la práctica de ingeniería.

Fué por esta razón, sin duda alguna, que la Legislatura no exigió experiencia anterior en todas las ramas de la ingeniería "como ingeniero civil, mecánico, electricista, etc.", que el solicitante de una licencia hubiera estado practicando. Sea ello como fuere, por esta razón es que este tribunal, hasta ahora, ha interpretado la ley algo liberalmente en favor del solicitante. Véanse los casos citados, supra.

La Enciclopedia de Nelson define la ingeniería eléctrica así:

"*Ingeniería, Eléctrica*, aquella rama de la ingeniería que tiene como idea básica el control de la energía eléctrica para el servicio humano con la mayor eficienc:a que sea compatible con la inversión económica. Puede dividirse de acuerdo con la clase de servicio envuelto en: telefónica, telegráfica, electroquímica, electroferroviaria, generación y trasmisión de energía, aplicac:ones industriales, alumbrado, etc. No se puede hacer una clasificación rígida, sin embargo, toda vez que muchos de estos servicios dependen entre sí.

"En todas las divisiones pueden observarse más o menos claramente tres clases de esfuerzo: (1) esfuerzo inventivo que abarca la investigación de los fenómenos, y el diseño y construcción de aparatos para utilizar descubrimientos; (2) el esfuerzo para el desarrollo del servicio, que abarca el estudio de las condiciones naturales, agrupación de la maquinaria y estudio y construcción de obras completas a fin de utilizar las fuerzas naturales y las invenciones humanas; (3) esfuerzo o gestión relativa al funcionamiento, que abarca la manipulación diaria de las máquinas y el suministro del servicio."

En *Isern* v. *Junta Examinadora de Ingenieros,* supra, el solicitante había trabajado con el Gobierno Insular como telegrafista y había estado empleado por una compañía de luz eléctrica. Como empleado de la compañía de la luz atendía por el día a la extensión de líneas y por la noche al cuadro de distribución y a las dínamos. Por espacio de dos años actuó como director de la planta eléctrica de Arecibo. Durante cinco años trabajó como inspector de las instalaciones hechas por la P. R. Railway, Light & Power Co., para el alumbrado público. Más tarde, y para la época en que hizo su solicitud, estuvo empleado en la agencia de Humacao de dicha compañía donde atendía a la extensión de las líneas

de la compañía, tanto primarias como secundarias, montaje de transformadores, motores, cocinas, calentadores y toda clase de aparatos tanto en Humacao, como en Yabucoa, Naguabo y Las Piedras.

La Junta Examinadora apeló de una sentencia adversa en un procedimiento de *mandamus* fundándose, entre otras cosas, en que el peticionario no había estado practicando como ingeniero electricista. La apelación fué desestimada por frívola.

A menos que debamos abandonar la doctrina del caso de Isern, Arana había estado practicando como ingeniero civil por espacio de más de tres años con anterioridad a la ley de 1927 y tenía por ende derecho a que se le expidiera licencia como ingeniero civil. Como base para su experiencia práctica ya él había completado dos años de instrucción en una escuela de ingeniería. Él estaba, para decir lo menos, tan bien preparado como la mayoría, si no como todos los solicitantes cuyos casos han venido hasta el presente ante este tribunal. No hallamos razón satisfactoria para revocar el *ratio decidendi* del caso de Isern.

La corte de distrito también resolvió que los aquí demandados no tenían deber ministerial que cumplir toda vez que no eran miembros de la junta en junio de 1928, cuando ésta, según estaba entonces constituída, se negó a expedir una licencia de ingeniero civil y en su lugar expidió una como ingeniero de caminos, canales y puertos. El presente caso se rige, a nuestro juicio, por el de *Romero* v. *Gore,* 46 D.P.R. 378, y no por los de *Negrón* v. *Superintendente de Elecciones,* 11 D.P.R. 366, y *Honoré* v. *Wilson,* 32 D.P.R. 827.

La corte de distrito también resolvió que el peticionario era culpable de incuria (*laches*). El peticionario radicó su solicitud para que se le expidiera una licencia, en enero de 1928. Le fué denegada en marzo del mismo año. Solicitó la reconsideración en abril. Ésta le fué denegada en mayo 29. En junio el solicitante insistió en su súplica y se le concedió

una vista el 19 del mismo mes. La junta entonces emitió opinión al efecto de que toda vez que el peticionario había estado empleado como sobrestante en el servicio de faros, su experiencia no había sido la de. un ingeniero civil e hizo constar que le expediría licencia como agrimensor e ingeniero de caminos, canales y puertos. Explicó que este título se otorgaba en España a los ingenieros civiles después de ocho años de estudios académicos y que era por ende idéntico al título de ingeniero civil mencionado en la ley de 1927. El peticionario, fundándose en esta información, aceptó la licencia de agrimensor, e ingeniero de caminos, canales y puertos.

Arana no supo que no estaba autorizado para ejercer la profesión de ingeniero civil hasta septiembre de 1933, cuando el Departamento de Sanidad rechazó ciertos planos que él había firmado y sometido a dicho Departamento para su aprobación. En octubre del referido año reanudó su solicitud para que se le expidiera una licencia como ingeniero civil, y la Junta Examinadora, por carta fechada 3 de julio de 1934, una vez más le denegó su solicitud. Arana entonces radicó su petición de *mandamus* el 12 de marzo de 1935. En su declaración jurada hacía constar todos los hechos anteriores, los cuales al no ser negados fueron admitidos por los demandados. Esos hechos presentan una explicación satisfactoria para la larga demora. El peticionario no fué culpable de incuria (*laches*). Véase: 38 C. J. 833, sec. 534; *State* v. *New Orleans Port,* 153 La. 705, 96 S. 539; *Blanco* v. *Domenech,* 45 D.P.R. 853.

El juez de distrito también dijo que si Arana era un ingeniero civil debió haber sabido que la licencia expedídale por la junta y aceptada por él no tenía valor alguno y comprendía tan sólo una rama de la ingeniería civil. Sin embargo, Arana no profesaba ser un ingeniero civil en el sentido en que el juez de distrito usó la frase. La ley no exigía que él fuera una ingeniero civil en ese sentido para obtener una licencia para ejercer como tal. El único requisito previo a

la expedición de tal licencia era la práctica anterior de tres años en ingeniería civil, con o sin los requisitos exigidos a aquellos que no hubieran tenido tal experiencia anterior.

*La sentencia apelada debe ser revocada y expedirse el auto de mandamus de conformidad con la súplica del peticionario.*

Los Jueces Asociados Señores Córdova Dávila y Travieso no intervinieron.